# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

———————————————————————
                                      )

**ERIN NICOLE KENNEDY,**           )
                                        )

        **Plaintiff,**               )

                                        )      **Civil Action No.**

        **v.**                      )      **11-11444-FDS**

                                        )

**MICHAEL J. ASTRUE, Commissioner,**  )
**Social Security Administration,**      )

                                        )

        **Defendant.**           )
———————————————————————)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

      This is an appeal from the final decision of the Commissioner of the Social Security Administration denying the application of plaintiff Erin Nicole Kennedy for Social Security Disability Benefits ("SSDI"). Plaintiff disputes the denial of her claim on two grounds: (1) that the ALJ did not sufficiently explain why he found her subjective complaints of pain and limitations less than fully credible, and (2) that the ALJ erred in failing to adopt the additional limitations posed in a hypothetical question to the vocational expert regarding the availability of positions for someone that had the physical limitations of the plaintiff, as well as the additional limitation that the individual would be off-task from any work for 25 percent of the work day.

      Pending before the Court is plaintiff's motion to reverse and the Commissioner's motion to affirm. For the reasons stated below, the motion to affirm will be granted and the motion to reverse will be denied.

I.      **Background**

A.      **Personal and Occupational History**

Plaintiff Erin Nicole Kennedy was born on October 23, 1975.  (A.R.. at 143, 183).  She lives in Leominster, Massachusetts, with her fiancee and his daughter, who is twelve years old. (*Id.* at 27).  She completed college with degrees in communications and English.  (*Id.*)

Kennedy previously worked as a salesperson in a clothing store from 1994 until 1996. (*Id.* at 161).  From July 1997 until September 2000, she worked as a customer-care specialist and as a claims administrator in the employee-benefits industry.  (*Id.* at 29, 160, 162).  She next worked as an executive assistant from October 2000 until February 2001.  (*Id.* at 159).  From June 2001 until February 2002, she worked as a consultant for a mortgage firm. (*Id.* at 159, 166). From May 2001 until December 2003, she worked at Outback Steakhouse in various capacities, including as a server and employee trainer.  (*Id.* at 159, 168).  Starting in February 2004, she worked as a management trainee for Enterprise Rent-a-Car.  (*Id.* at 159).

Four months after starting at Enterprise, Kennedy suffered the injury that would eventually lead to this disability claim.  (*Id.* at 29).  She was out on disability for four months, returned part-time for two months, and then again worked full-time for nine months. (*Id.*)

B.      **Medical History**

In her testimony before the ALJ, Kennedy stated that during her early twenties, she had family problems and was diagnosed with anxiety.  (*Id.* at 35).  Since at least June 2001, she had been reporting depression to her primary-care physician, Dr. Daniel O'Leary, and had been taking Prozac, which she found beneficial.  (*Id.* at 624).

On June 17, 2004, Kennedy was involved in an automobile accident that resulted in a

severe fracture to the calcaneus bone in her right foot.  (*Id.* at 241, 597).  She was admitted to

UMass Memorial Hospital in the care of Dr. Walter J. Leclair.  (*Id.* at 597).  On June 23, 2004,

Dr. Leclair performed an operation on her foot, using metal plating to realign and immobilize the

fractured bone.  (*Id.* at 239-40).  On July 6, 2004, Kennedy returned for a follow-up appointment

with Dr. Leclair.  (*Id.* at 238).  Dr. Leclair noted that the healing process was on schedule, and

prescribed Vicodin for pain.  (*Id.*).

Between July and October 2004, Kennedy met with Dr. Leclair for a number of follow-

up appointments.  (*Id.* at 230-37).  During this time, she began physical therapy at Ramsey

Rehabilitation, and was able to bear increasing weight on her right foot, progressing from

crutches to a single crutch.  (*Id.*).  X-rays showed maintenance and healing of the fracture.  (*Id.*).

She met with Dr. Leclair again on November 30, 2004.  (*Id.* at 229).  She had increased her

ability to walk distances, though she mentioned that she occasionally needed to sit and elevate

her foot to relieve swelling.  (*Id.*).  Dr. Leclair also wrote Kennedy a note indicating that she

could work five hours a day, on the condition that she be able to lift her foot as needed.  (*Id.*).

On May 17, 2005, Kennedy met again with Dr. Leclair.  She reported intermittent

complaints of discomfort in her foot, predominantly in the lateral aspect, which was consistent

with lateral impingement.  (*Id.* at 227).  Dr. Leclair noted that the calcaneus looked fully healed.

(*Id.* at 532).  He also noted some tenderness in the region of the surgery scar and in the lateral

fibula region and peroneal tendon region.  (*Id.* at 227).  Kennedy met again with Dr. Leclair on

September 23, 2005.  (*Id.* at 226).  She reported that she had been experiencing burning

discomfort in her foot as well as difficulty standing.  (*Id.*).

On October 11, 2005, Dr. Leclair administered an anesthetic injection, which caused

Kennedy's lateral impingement pain to disappear, but she continued to experience pain near her Achilles tendon.  (*Id.* at 225).  She returned on December 6, 2005, for a follow-up, where she reported significant improvement from the injection, but only for a short period. (*Id.* at 224).  Dr. Leclair administered an additional anesthetic injection.  (*Id.*).  He also discussed subtalar arthrodesis, a surgical stiffening of the joint, as a potential pain remedy. (*Id.*).

Kennedy decided that undergoing a subtalar arthrodesis to fuse the joint surgically would be the best course of action and underwent the procedure on January 18, 2006.  (*Id.* at 221).  The surgery was completed successfully.  (*Id.* at 221).  At subsequent follow-up visits with Dr. Leclair in January, March, and April, x-rays revealed no abnormalities and the incision wounds were healing appropriately.  (*Id.* at 214, 215, 217).

On May 17, 2006, Kennedy returned to UMass Memorial Hospital for a consultation with Dr. Michele Patterson.  (*Id.* at 212, 626).  She reported that she had recently fallen outside her home and was experiencing pain as a result.  (*Id.* at 212).  She also reported that her pain level was usually at a five or six out of ten, but after falling her pain had risen to a nine or ten out of ten.  (*Id.*).  X-rays showed that the hardware from the January operation was still intact.  (*Id.*).  Dr. Patterson noted that there was a post-traumatic deformity of calcaneus from the initial injury, but there were no fractures as a result of the fall.  (*Id.*).  She also noted color changes in the foot and some hypersensitivity to touch, but that otherwise Kennedy was physically well.  (*Id.*).  Kennedy reported to Dr. Patterson that she was taking two tablets of Vicodin every four hours and 75 milligrams of Zoloft daily for anxiety and depression.  (*Id.*).

On June 5, 2006, Kennedy met with Dr. O'Leary, complaining of persistent pain in her foot.  (*Id.* at 617).  Dr. O'Leary advised her on the use of short-term pain-reduction narcotics,

and placed her on a long-standing, low-dose Duragesic patch to help alleviate pain due to the potential for addiction and previous addictive behavior.  (*Id.*).

Kennedy visited Dr. Patterson again on July 19, 2006.  (*Id.* at 210).  She reported that her pain still persisted and ranged anywhere from a two to a five out of ten.  (*Id.*).  Dr. Patterson hypothesized that she was beginning to develop reflex sympathetic dystrophy or complex regional pain syndrome.  (*Id.*).  She advised her to discontinue her morning dose of Vicodin and attend physical therapy to improve her calf strength. (*Id.* at 210).

On August 18, 2006, Kennedy met again with Dr. Leclair.  (*Id.* at 208-09).  During the visit, she complained of back pain with radiating pain down the back of her legs to her knees (worse on the left side) and minor foot pain.  (*Id.*).  She also reported that she was experiencing Achilles tendinitis.  (*Id.*).  She mentioned that she was wearing a night splint for the tendinitis, but that it had not been effective.  (*Id.*).  She also reported that after falling at home in mid-May 2006, she began experiencing pain in her lower back.  (*Id.* at 637).  Dr. Leclair examined her back and found some mild lumbosacral paraspinal tenderness to touch and some left-sided sciatic notch tenderness.  (*Id.*).  X-rays of her spine showed a significant narrowing of the disk space with sclerotic changes, but no spinal defects or slipped disk.  (*Id.*).  Dr. Leclair also noted a loss of lumbar lordosis related to muscle spasms and progressive degenerative disc changes with narrowing sclerosis changes and gas formation.  (*Id.*).

Kennedy again met with Dr. Leclair on September 22, 2006.  (*Id.* at 207).  Dr. Leclair noted that her foot seemed to be improving.  (*Id.*).  A spinal MRI showed that there was a herniated disk.  She also complained again of radicular pain deriving from her spine.  (*Id.*).  Dr. Leclair referred her to a spine specialist.  (*Id.*).  He also refilled her prescriptions for Vicodin and

Flexeril.  (*Id.*).

Kennedy returned to Dr. Leclair on December 19, 2006, with complaints of continued pain in her right foot and ankle region.  (*Id.* at 480).  Dr. Leclair noted that she generally required a single crutch to get around.  (*Id.* at 482).  He ordered x-rays be taken on her foot and found that the screws were intact and the fusion continued to be stable.  (*Id.* at 480).  He ordered a CT scan on her right foot that showed excellent healing of the calcaneal fragments, but noted some fracture lines, most notably in the mid-portion of the calcaneus.  (*Id.* at 484).  There also was partial bony bridging of the posterior subtalar joint and bony fragments and moderate swelling along the ankle.  (*Id.*).

Kennedy met with Dr. Anthony Teebagy at the Lahey Clinic in Burlington, Massachusetts, on March 6, 2007, for a second opinion.  (*Id.* at 577).  She reported persistent pain and discomfort, specifically anterior to the ankle joint and just medial to the Achilles tendon, as well as her back.  (*Id.*).  Dr. Teebagy ordered a CT scan of her ankle, which appeared normal, although the calcaneal cuboid joint showed some mild arthrosis, a degenerative joint disease. (*Id.*).  Dr. Teebagy advised removing the hardware in her foot.  He noted that he would not prescribe pain medication.  (*Id.*).

On July 26, 2007, Kennedy met with Dr. Alberto Cabantog at New England Pain Associates.  (*Id.* at 685-88).  She described her pain as aching, shooting, stabbing, sharp, and burning.  (*Id.* at 685).  She reported that the pain was worse when walking, lifting, bending, sitting, or standing and during changes in weather.  (*Id.*).  She also reported that the pain was at a five or six mostly but could be as bad as ten out of ten.  (*Id.*).  She also reported the pain had made her angry, exhausted, depressed, and frustrated.  (*Id.*).  Dr. Cabantog's impression was as

follows: "Patient's symptom is probably coming from neuropathy but there are components of nociception and multiple fracture lines seen in the most recent MRI." (*Id.* at 687). Dr. Cabantog noted that there was no scoliosis, but there was tenderness of the paraspinal muscles and spinous processes with full spinal range of motion, and some orientations of Kennedy's spine did produce pain. (*Id.*). Dr. Cabantog informed her that opiate medication was inappropriate and prescribed Neurontin to help alleviate pain. (*Id.*).

On September 4, 2007, Kennedy went to the Boston Sports and Shoulder Center to meet with Dr. Mark Slovenaki. (*Id.* at 689). She was still using a crutch at that time. (*Id.*). She and Dr. Slovenaki discussed her various sources of pain and various treatment plans. (*Id.*). She mentioned her past medication issues and reported that she fired her primary-care physician because of their disagreement on the topic. (*Id.*). Dr. Slovenaki was unable to make a conclusive determination as to the source of the pain in her foot. (*Id.*).

Kennedy next met with Dr. Ali Baalbaki at New England Pain Associates on September 20, 2007. (*Id.* at 683). She reported that there was no change in pain after taking the Neurontin and requested opioid medication. (*Id.*). Dr. Baalbaki refused and suggested the non-opioid medication Lyrica. (*Id.* at 684). Kennedy said she would not go on anything other than opioids and refused any more intervention at the pain clinic. (*Id.*).

On October 9, 2007, Kennedy met again with Dr. Slovenaki. (*Id.* at 693-94). X-rays showed that there had been status post-subtalar fusion. (*Id.* at 694). Dr. Slovenaki noted some degenerative changes in the region, but there did not appear to be any significant interval change since the previous study. (*Id.*).

Kennedy next met with Dr. Assia T. Valovska at the Pain Management Center in

Chestnut Hill, Massachusetts, on December 19, 2007.  (*Id.* at 696-97).  Dr. Valovska

performed a physical examination, which revealed hyperesthesia, skin discoloration, limited

range, and temperature differential in the right foot.  (*Id.*).  Kennedy requested opioid

medication, but Dr. Valovska informed her that she would needed a primary-care physician to

obtain those medications. (*Id.*).

In December 2007, Kennedy obtained a new primary-care physician, Dr. Marcello

Panagia in Chestnut Hill, Massachusetts.  (*Id.* at 190).  After a psychological evaluation, Dr.

Panagia re-prescribed Zoloft. (*Id.*).

Kennedy met with Dr. Robert Jamison, a psychologist, on April 7, 2008.  (*Id.* at 731).

She reported an inability to sleep during the night and only occasional naps during the day.

(*Id.*).  She also said she was socially isolated, almost completely sedentary, and reported mood

swings, including anxiety and periodic crying.  (*Id.*).  She reported that she had a history of

alcohol dependence, and that her family had a significant history of substance abuse.  (*Id.*).  Dr.

Jamison conducted a Screener and Opioid Assessment for Pain Patients, which suggested a

high risk of medication misuse.  (*Id.*).  Kennedy stated that her prescriptions were not getting

filled, as she was having trouble with her workers' compensation claim and was running into

financial problems.  (*Id.* at 731).  She said she did get some of her medications from family

members.  (*Id.*).  She mentioned that she was no longer taking Zoloft, which had been helpful

in the past.  (*Id.*).  Dr. Jamison noted that Kennedy was suffering from multifocal pain and

reactive depression and anxiety, and that she had disability issues and multiple psychosocial

stressors in her life.  (*Id.*).  He noted that she would benefit from medications designed to

stabilize her mood, and individual psychotherapy sessions.  (*Id.*).  At the end of the session, Dr.

8

Jamison recommended that she pursue individual psychotherapy and offered his own services as needed.  (*Id.*).

On April 17, 2008, Kennedy met again with Dr. Valovska.  (*Id.* at 695).  Dr. Valovska noted Dr. Jamison's findings from his meeting with Kennedy in her report.  (*Id.*).  Kennedy reported that she still had pain in her lower right extremity, and that she experienced pain up to a seven or eight out of ten.  (*Id.*).  She also said that she could neither work nor sleep and was quite disrupted by her pain.  (*Id.*).  She reported experiencing pain from her lower back going down into her left leg and into her ankle, which Dr. Valovska described as radiculopathy, a disease of the spinal nerve roots.  (*Id.*).  Dr. Valovska advised her to receive a sympathetic nerve block for pain, and proposed a possible nerve block for the disk stenosis.  (*Id.*)

On May 19, 2008, Kennedy filled out a Function Report as part of her application for disability benefits that described her physical abilities and daily activities while dealing with her injuries.  (*Id.* at 174-81).  She reported that her daily activities mainly consisted of lying on the couch and watching television.  (*Id.*).  She occasionally drove to her parents' house across town to let their dog out.  She felt she could no longer perform many activities, including walking, running, jumping, dancing, sleeping, and bending.  (*Id.*).  She also noted that her injuries had a negative effect on her dress, hygiene, hair care, and diet, as well as her ability to perform chores around the house.  (*Id.* at 175-76).

On June 18, 2008, Dr. Leslie Caraceni filed a Physical Residual Functional Capacity ("RFC") Assessment on Kennedy as part of a disability determination.  (*Id.* at 701).  The assessment noted that she could occasionally lift twenty pounds and frequently lift ten pounds. (*Id.*).  She could stand or walk for a total of at least two hours in an eight-hour workday, but

did require a crutch.  (*Id.*).  She could also sit for six hours of an eight-hour workday.  (*Id.*).

She could not climb, and can balance, stoop, kneel, crouch, and crawl occasionally.  (*Id.* at

702).  The assessment also noted that she was limited in her ability to reach in all directions

because her right hand was not available when she was standing with her crutch.  (*Id.* at 703).

The assessment found no visual or communicative limitations, but stated that she should avoid

concentrated exposure to hazards, such as machinery or heights.  (*Id.* at 704).

In August 2008, Dr. Milton Taylor of the Massachusetts Rehabilitation Commission

Disability Determination Services prepared a Consultative Examination Report on Kennedy.

(*Id.* at 708-712).  Dr. Taylor noted that Kennedy was cognitively capable of performing a full

range of activities of daily living, but she contended that she was limited by pain.  (*Id.*).

Kennedy reported that she was unable to perform any activities involving prolonged standing,

walking, sitting; she had difficulty driving because of the medical impairment of her right foot;

and she seldom left her house and was significantly less social.  (*Id.*).  Dr. Taylor noted that her

grooming, eye contact, and speech were normal.  (*Id.* at 710).  She had no suicidal, homicidal,

or paranoid ideas, and had logical and orderly thinking.  (*Id.* at 711).  He noted that her mood

was consistently characterized by anger, frustration, and depression.  (*Id.*).  She reported

feeling frustrated because she had run into difficulty in obtaining the necessary medical

interventions she felt were necessary to return to work and move on.  (*Id.*  at 710).  Dr. Taylor

also administered a Folstrin Mini-Mental State Exam, which showed that Kennedy's

performance was "mildly impaired," and assessed her global assessment of functioning (GAF)

score at 60.  (*Id.* at 711-12 ).[1]  Dr. Taylor concluded that she was suffering from chronic

adjustment disorder with mixed emotional features.  (*Id.* at 712).  He also noted that there was

no reason to believe that she was clinically depressed or anxious prior to the onset of her

injury.  (*Id.*).

In September 2008, Dr. Peter Robbins completed a psychiatric review of Kennedy.  (*Id.*

at 713-27).  According to his report, she exhibited a mild restriction of activities of daily living

and mild difficulties in maintaining social function, concentration, persistence, and pace.  (*Id.*

at 723).  Dr. Robbins determined that she suffered from a mental impairment, but one that was

not severe.  (*Id.* at 713).  He diagnosed an adjustment disorder with depressed mood anxiety.

(*Id.* at 716).

On November 20, 2008, Dr. Valovska gave Kennedy an injection in her lumbar spine

region to relieve pain.  (*Id.* at 730).  At a follow-up meeting on December 18, 2008, with Dr.

Valovska, she noted that she had experienced very good pain relief for more than three weeks

after the block.  (*Id.* at 729).  During that period, Kennedy said her pain was at a two out of ten.

(*Id.*).  She explained that after the approximately three-week period, the pain returned to

baseline levels at a five or six out of ten. (*Id.*).

Dr. Robert McGan prepared a second Physical RFC Assessment on January 19, 2009.

(*Id.* at 733-40).  Her external limitations were identical to those of the previous assessment in

June 2008.  (*Id.* at 734).  Her postural limitations were the same as in the last assessment, other

---

[1] A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school situations, but general functioning and the existence of some meaningful personal relationships.  A score between 51 and 60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational, or school situations.  *See Petrie v. Astrue*, 412 Fed. Appx. 401, 406 n.2 (2nd Cir. 2011) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376–77 (4th ed., text revision, 2000)).

than the fact that she was now deemed to be able to occasionally climb.  (*Id.* at 735).  She was

again found to have no visual or communicative limitations, but was not found to have any

manipulative limitations, as in the earlier assessment.  (*Id.* at 736-37).  In terms of

environmental limitations, the report said that she should avoid hazards as well as concentrated

exposure to extreme cold, wetness, humidity, fumes, odors, dusts, and gasses because of her

asthma.  (*Id.* at 737).

On February 7, 2009, Dr. Mark Brooks of the Massachusetts Rehabilitation

Commission Disability Determination Services prepared a second Consultative Examination

Report.  (*Id.* at 741-45).  His report noted that Kennedy could not engage in regular activities

related to her residence because of her physical limitations and that she was limited in her

grooming and hygiene activities.  (*Id.*).  Kennedy was able to use the phone and post office and

would be able to manage disability benefits if she was to receive them.  (*Id.*).  Dr. Brooks noted

that she was alert, oriented, and cooperative, and was dressed and groomed appropriately.

(*Id.*).  He also noted that she reported experiencing fluctuating symptoms of anxiety and

depression over the last several years, as well as chronic and significant irritability.  (*Id.*).  She

contended she was quite angry and had verbal outbursts in response to minimal prompts or

stresses, including intermittent physical aggression against people.  (*Id.*).  She reported

experiencing anxiety on a daily basis in response to any frustrating situation, but did not

provide clear prompts or triggers.  (*Id.*).  She reported fatigue, low energy, and slow

movement, and that she had been suffering from insomnia for at least eight months.  (*Id.*).  She

said that she had very poor attention and concentration, attributes that were confirmed in recall

testing performed by Dr. Brooks.  (*Id.*).  She also reported problems sitting, standing, walking,

and lifting due to physical impairments.  (*Id.*).  She said she was very scared about the future, and that she had lost interest in pleasurable activities.  (*Id.* at 742-43).  She denied being suicidal, but admitted she sometimes felt as though she would be better off dead.  (*Id.* at 743).  Dr. Brooks diagnosed moderate major depressive disorder of the single episode kind and gave her a GAF score of 60 to 65.  (*Id.* at 744).  Dr. Brooks recommended that she participate in medical, psychiatric, and psychological treatment related to depressive disorder.  (*Id.*).  His prognosis for Kennedy was "guarded."  (*Id.*).

On February 11, 2009, Dr. Lawrence Langer, Ph.D., performed a Mental RFC Assessment.  (*Id.* at 746-48).  Dr. Langer noted that her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods were all moderately limited.  (*Id.* at 746-47).  Her ability to respond appropriately to changes in the work setting, and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, was moderately limited, but her ability to interact appropriately with general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness were not limited.  (*Id.* at 747).  Dr. Langer concluded that Kennedy would be able to get along with coworkers without distracting them, adapt to minor changes in the work place understand, remember short and simple instructions, carry out one or two-step instructions, maintain attention for two-hour intervals and complete a normal work week at a sufficient pace.  (*Id.* at 748).  Dr. Langer diagnosed a full or partial

depressive syndrome characterized by pervasive loss of interest in almost all activities, sleep

disturbance, decreased energy, and difficulty concentrating or thinking.  (*Id.* at 753).

In December 2010, Dr. Ronald Jolda, D.O., prepared a third Consultative Examination

Report.  (*Id.* at 764-771).  Kennedy reported that her anxiety was out of control, and that she

was not and had not received any intervention for her anxiety.  (*Id.*).  She also stated she was

experiencing chronic pain in her right foot and back.  Dr. Jolda, however, found that anatomic

reconstruction of her foot and ankle was good, and it was unclear why Kennedy was

experiencing so much pain.  (*Id.* at 767-68).  He noted in his report that Kennedy could

probably be significantly improved in all aspects of her life, but the first step would be to seek

and receive appropriate mental health care in order to get a handle on her anxiety and

depression.  (*Id.* at 768).

## C.    **Procedural Background**

On January 8, 2008, Kennedy applied for Social Security disability benefits, with a

listed onset of disability date of January 18, 2006.  (*Id.* at 9).  The application was denied

initially on September 8, 2008, and again upon reconsideration on February 11, 2009.  (*Id.*).

On April 9, 2009, she requested a hearing, which was held on November 1, 2010.  (*Id.*).  She

was represented by counsel at the hearing.  (*Id.*).  Both Kennedy and a vocational expert

testified at the hearing.  (*Id.*).  The vocational expert, Elaine Cogliano testified that someone

with Kennedy's limitations (described above in the Physical and Mental Residual Functional

Capacity Assessment) would be able to find work as an office worker, information clerk, or

some other sedentary position. *(Id.* at 49).  If one were to add in the qualification that, due to

psychiatric issues and chronic pain, Kennedy would be off-task for twenty-five percent of her

day, Ms. Cogliano testified that there would no positions available for someone with her

limitations.  (*Id.*).

On May 20, 2010, the ALJ issued a decision finding that she was not disabled.  (*Id.*

at 7).

The Decision Review Board selected the decision for review.  (*Id.* at 6).  Kennedy's

counsel filed a written statement with the Decision Review Board asking the Board to pay

particular attention to the testimony of the vocational expert in response to the alternative

hypothetical.  (*Id.* at 4-5).  The Decision Review Board did not take action within 90 days,

making the ALJ's decision final.  (*Id.* at 1).  On March 14, 2011, Kennedy filed the complaint

in this action.

## II.    Analysis

### A.    Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final

decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. §

405(g).  The Commissioner's factual findings, "if supported by substantial evidence, shall be

conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence,

where reasonable minds could differ as to the outcome, falls on the Commissioner and his

designee, the ALJ.  It does not fall on the reviewing court."  *Seavey v. Barnhart*, 276 F.3d 1, 9

(1st Cir. 2001) (citation omitted); *Rodriguez Pagan v. Sec'y of Health & Human Servs.*, 819

F.2d 1, 3 (1st Cir. 1987) (noting that the court "must affirm the Secretary's resolution, even if

the record arguably could justify a different conclusion, so long as it is supported by

substantial evidence").  Substantial evidence means "such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Questions of law, to the extent that they are at issue in the appeal, are reviewed *de novo*. *Seavey*, 276 F.3d at 9.

### B.      Standard for Entitlement to SSDI Benefits

An individual is not entitled to SSDI benefits unless he or she is "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1), (d) (setting forth the definition of disabled in the context of SSDI). "Disability" is defined, in relevant part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be severe enough to prevent the plaintiff from performing not only past work, but any substantial gainful work existing in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[2] "The applicant has the burden of

---

[2] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process." *Seavey*, 276 F.3d at 5.

production and proof at the first four steps of the process," and the burden shifts to the

Commissioner at step five to "com[e] forward with evidence of specific jobs in the national

economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st

Cir. 2001).  At that juncture, the ALJ assesses the claimant's RFC in combination with the

"vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R.

§ 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial

gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

### C.    The Administrative Law Judge's Findings

In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20

C.F.R. § 404.1520(a)(4).

At the first step, the ALJ found that plaintiff had not engaged in substantial gainful

activity from January 18, 2006, the alleged onset date of his disability, through her date last

insured, which was December 31, 2010.  (AR at 11).

At the second step, the ALJ found plaintiff's right calcaneus fracture with residual pain,

degenerative disc disease of the lumbar spine, and depression and anxiety to be severe

impairments based on objective medical evidence.  (*Id*.).

At the third step, the ALJ determined that the plaintiff's impairments did not meet or

medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1,

while specifically considering the criteria in sections 1.00 and 12.00.  (*Id.* at 12).  The ALJ

determined that plaintiff did not satisfy the "paragraph B" or "paragraph C" criteria for mental

impairments.  (*Id.*).

At the fourth step, the ALJ found that plaintiff's RFC allowed her to perform sedentary

work, including lifting ten pounds, standing and walking two hours and sitting six hours during an eight-hour workday. (*Id.* at 13). She would require a position with a "sit to stand option at will," and would be limited to occasional use of ramps and stairs, stooping, crouching, crawling, and kneeling. (*Id.*). She would be unable to climb ladders, ropes or scaffolds, and would be incapable of activities involving foot or leg controls, and overhead lifting or reaching. (*Id.*). The ALJ also determined that she would need to avoid all exposure to extreme cold, vibration, and heights, and would be limited to simple unskilled tasks. (*Id.*). Given this RFC, the ALJ found plaintiff incapable of performing her past relevant work. (*Id.*).

At the fifth step, the ALJ found that given plaintiff's RFC, age, education, and work experience, there were jobs that existed in significant numbers in the national economy that she could have performed, including office worker, information clerk, and surveillance system monitor. (*Id.* at 20). The ALJ consequently made a finding that plaintiff was not disabled. (*Id.* at 21).

> **D.     Alternative Hypothetical Question**

Plaintiff contends that the ALJ should have adopted the additional limitations provided in an alternative hypothetical question that the ALJ posed to the vocational expert. The additional limitations included chronic pain and psychiatric limitations that would put the individual off her task for at least 25 percent of the work day. (*Id.* at 49). The vocational expert opined that with those additional limitations, such an individual would not be employable. (*Id.*). Plaintiff contends that a determination that plaintiff possessed these additional limitations is supported by substantial evidence.

Plaintiff appears to confuse the applicable legal standard here. The factual findings of

*the Commissioner* are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g);

*Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  The question of

whether plaintiff's proposed factual findings might be supported by substantial evidence is not

at issue, and in any case, such a determination would not preclude a determination that the

Commissioner's factual findings are also supported by substantial evidence.  *See Rodriguez*

*Pagan*, 819 F.2d at 3 (noting that different conclusions could be supported by substantial

evidence).

The ALJ's decision not to adopt the additional limitations from the alternative

hypothetical question is supported by substantial evidence.  With respect to psychiatric

limitations, the ALJ noted that plaintiff received no formal psychiatric care, had never been

hospitalized for mental health difficulties, and was not under medication at the time.  (AR at

11).  Multiple mental tests and examinations showed her to be suffering from only mild to

moderate impairments.  (*Id.* at 17-18).  Reports from doctors showed that plaintiff's complaints

of pain could not be explained by objective medical evidence.  (*Id.* at 11, 19).  Her pain was

also successfully treated on a number of occasions, and a medical examination indicated that

with appropriate care, she could be weaned off pain medications.  (*Id.* at 15-19).  The ALJ's

decision that plaintiff did not suffer from chronic pain and psychiatric limitations that would

put her off task for at least 25 percent of the work day is supported by substantial evidence and

plaintiff is not entitled a reversal on this basis.

### E.      Plaintiff's Credibility

Plaintiff further contends that the ALJ erred in determining that her testimony

concerning her pain and functional limitations was not credible and that the ALJ failed to make

the requisite specific findings.  As a general matter, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated h[er] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference . . . ."  *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (citing *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F. 2d 24, 26 (1st Cir. 1986)).  However, the ALJ "must make specific findings as to the relevant evidence [s]he considered in determining to disbelieve" the plaintiff. *Da Rosa*, 803 F.2d at 26.

Alleged functional limitations and restrictions due to symptoms must be reasonably consistent with medical evidence and other evidence, including statements and reports by the claimant and treating sources.  20 C.F.R. § 404.1529.  Factors considered in assessing the severity of symptoms include daily activities; location, duration, frequency, and intensity of symptoms; type, dosage, effectiveness, and side effects of medication; and treatment or any other measures used to relieve symptoms.  *Id.*; *see also Avery v. Sec'y of Health and Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986).  An ALJ is not required to discuss specifically all these factors in making a decision.  *Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010).

Specifically, plaintiff contends that Dr. Jolda's report that her complaints of pain were "out of line" with the findings and "probably reflects her heightened anxiety" should be considered as part of her diagnosis of depression and anxiety.  The fact that plaintiff's complaints of pain were unsupported by objective findings is relevant in an assessment of credibility.  Furthermore, the ALJ did not consider that statement in a vacuum, and in fact also noted Dr. Jolda's comments that the pain complaints were probably due to heightened anxiety

and Dr. Jolda's overall conclusion that plaintiff's condition could be significantly improved with appropriate mental care and a proper orthopedic evaluation and treatment.  (AR at 19).

The ALJ properly considered the relevant factors and made specific findings in determining that plaintiff's testimony was not credible.  The ALJ examined her medical record in detail, and Dr. Jolda's report was only one of many reports that the ALJ reviewed.  The ALJ's decision indicated that on a number of occasions, the doctors examining her could not find evidence to explain her complaints of pain.  (AR at 15, 19).   The ALJ also noted that her medically identified impairments could not reasonably be expected to cause the claimed limitations, and that her claims of incapacitation were not fully credible in light of her ability to perform a wide range of daily activities.  (*Id.* at 19).  The ALJ further noted that her physicians declined to declare her totally disabled.  (*Id.*).  The ALJ's assessment of her credibility was appropriate and supported by specific findings, and plaintiff is not entitled to a reversal on that basis.

### III.   Conclusion

For the foregoing reasons, plaintiff's motion to reverse the decision of the Commissioner is DENIED, and the Commissioner's motion to affirm is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 28, 2012

21